In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-11-00013-CR

                                                ______________________________

 

 

                                       TIMOTHY MALONE,
Appellant

 

                                                                V.

 

                                     THE STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                       On Appeal from the 159th
Judicial District Court

                                                           Angelina County, Texas

                                                         Trial Court
No. CR-29753

 

                                                    
                                              

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                        Memorandum Opinion by Chief Justice Morriss








                                                      MEMORANDUM OPINION

 

            Ironically
and sadly, Crystal Rita’s party celebrating the completion of her criminal
justice degree resulted in two shootings, one fatal and one the subject of this
appeal.

            The festive
atmosphere of Crystal’s graduation party was shattered when drunken former
correctional officer Timothy Malone shot Crystal’s boyfriend and killed another
partygoer.  For shooting the boyfriend,
Malone was convicted by a jury of aggravated assault with a deadly weapon,
sentenced to five years’ imprisonment, and assessed a $5,000.00 fine.  Malone’s appeal all centers on his claim of
self-defense.  We affirm the trial
court’s judgment because (1) sufficient evidence supports the rejection of
Malone’s self-defense claim, and (2) the jury charge was proper on the two
self-defense-negating issues of provocation and unlawfully carrying a weapon.

(1)        Sufficient Evidence Supports the
Rejection of Malone’s Self-Defense Claim

 

            The
party took place at Crystal’s Hudson, Texas, home.[1]  She invited friends, including co-worker
Malone, a correctional officer for the Texas Department of Corrections at the
Wynne Unit in Huntsville, Texas. 
Although Malone lived approximately eighty miles[2]
away in New Waverly, he accepted the party invitation.  Crystal advised that there would be alcohol
at the party, including her concocted “trash can punch,” and promised Malone “a
bed for him to sleep.”  

            Malone
arrived on a motorcycle, which he parked “real close” to the front door of
Crystal’s home.  He delivered an open
bottle of vodka to Crystal, who believed he had been drinking.  Since he was spending the night at the home,
Malone walked over to Crystal’s live-in boyfriend, Joel Gresham, “said he had
already been drinking a little bit,” and gave Gresham the keys to the
motorcycle “right off the bat” “so they’d be safe.”  Within Malone’s sight, Gresham took the keys
to his room and put them into his clothing cabinet “where they would be safe
and away from everybody.”  The two
returned to the party outside and socialized with others while drinking.  

            Crystal
testified that Malone consumed two glasses of alcoholic punch, a shot of
Patron, and several beers.  While “it was
still early,” Crystal became nauseated and dizzy after consuming too much
alcohol.  She “stepped inside the house”
to “cool down,” but was “out for about an hour, hour and a half,” until she was
physically helped to the master bedroom where she lay down.  

            During
the party, Malone asked Kenneth Lee Allsbrooks if someone could give him a ride
to New Waverly.  Allsbrooks, claiming he
was “playing around,” responded, “Yeah, I’ll give you a ride back over there if
you leave the motorcycle in the back of my truck with a title to it.”  According to Jordan Perkins, Malone took the
comment seriously and “got a little agitated, a little mad.”  The conversation became heated.  Perkins testified Malone “told [Allsbrooks] .
. . a couple of words I’m not going to say in here.  But he didn’t want to talk to him.”  Malone said, “Go on. Get out of my face”  “I don’t want him to talk to me.  I don’t trust him.”  Perkins “told [Allsbrooks] to walk off” and
explained to Malone that they were joking and would not mind taking him home
and unloading the motorcycle.  

            Gresham
testified that Malone “was kind of getting talkative, starting to say that,
yeah, ‘They’re going to take my motorcycle’ and stuff like that, and he was
talking back to them.”   Gresham believed
that Malone “was kind of going overboard about what they were doing because
they were just joking with him, that I could tell . . ..  And I know when I overheard it, that Jordan
was trying to explain that to him.”  Gresham
told Perkins to “shut up.  Told [Malone]
to hush.  ‘You-all stop the
conversation.’”  Perkins also believed
that Terry Adams “and Mr. Malone had a little fallout a little bit.  [Adams’] wife, Stephanie, was getting
dressed, changing clothes in her truck; and Mr. Malone asked if he could attend
in the changing towards [Adams] with Stephanie.”  Adams “kind of upset him.”  

            After these
occurrences, Gresham escorted Malone to the room where he would be
sleeping.  Gresham testified that Malone
grabbed another beer, even though he was “pretty drunk,” and sat down on the
bed.  Michael Skates testified that he
overheard a conversation where Allsbrooks jested he was going to make Malone
“think that somebody was messing with his bike.”  Crystal testified, “I had heard the truck
revving up outside.  [Perkins] and his
friend [Allsbrooks] had two trucks that’s got big pipes on them.  And they were having a revving-up
contest.”  Gresham testified the two
trucks, which were parked far away from the motorcycle, were much louder than
Malone’s motorcycle.  

            Malone
testified, “I got up.  I removed my
firearm from the holster . . . and I proceeded to the front door” because he
believed someone was stealing his motorcycle. 
He admitted that he opened the front door and stated, “Who’s messing
with my f***ing bike?”  Skates testified
that, despite the profanity, the tone of the question was “[r]eal mellow.”  Andrew Cockrell, who was standing outside,
observed that Malone “had the gun pointed downwards.”  

            Gresham
responded by “trying to let Malone know that his motorcycle keys were still in
[the] cabinet . . . , and his bike was safe, that nobody’s been messing with
his bike.”  Perkins also “showed [Malone]
that the bike has never been moved; no one’s been over there near it.”  Malone “looked around” and confirmed “that
there was obviously nobody on my bike. 
There was nobody near my bike.” 
Nevertheless, the danger did not dissipate.

            Gresham
testified, “[Adams] asked [Malone] why he had a gun at the door” in a calm
manner.  This differed from Skates’
testimony that Adams “dropped his beer that he had in his hand, walked up to
Mr. Malone, and told him to put the damn gun down,” and Cockrell’s testimony
that Adams “was a bit angry” when he told Malone to “[p]ut the MF gun
away.”  Wanting Malone “gone from [the]
house since he had a gun,” Gresham told Malone he “was going to go get his key
so he c[ould] leave.”  Gresham remained
calm until he was blocked by Malone from entry into the house.  Perkins related:

            [Gresham] walked up to him.  Wanted to know what he was doing, why he
pulled a gun.  [Malone] told—put his hand
in front of [Gresham], told [Gresham] he needed to back down the stairs.  [Gresham] backed down the stairs.

            [Adams] came around, walked in front
of [Gresham]; and he asked 

Mr.
Malone why did he pull a gun, why does he have a gun at this party.

            And
Mr. Malone kept looking around, but with a hand in front of [Adams] and [Gresham],
telling them that they’re not going to come forward.

 

Skates testified Gresham did not shove, but “kind of forced
his way into the house,” while Adams told the group “[y]ou-all call the
cops.  Get them out here.  I’m going to try to get him to put the gun
down here.”  Skates continued:

As
I stood here, Mr. Adams spoke several times without—without yelling, again,
without yelling.  Had asked Malone to put
the gun down.  He said no, he wanted his
keys.  He had assured Malone that the
keys . . . was going to be brought to him. 
Malone still didn’t want to drop the gun.  Mr. Adams asked him, “Is the gun loaded?”  Malone said, “Yes, it is.”  And I remember [Adams] reaching out for the
gun, and that was when the first shot . . ..  And I watched [Adams] take that shot. Got his
arm out.  Just went to rapid-fire.

 

            Crystal
testified Gresham was already retrieving Malone’s keys “[a]t the time that
[Adams] had actually asked [Malone] if the gun was loaded.”  Gresham remembered that Adams “asked him
again why he had the gun or if he was going to put it away . . ..  And a fire—I guess a first shot
happened.  I don’t know because I was
walking past, and I turned around to see what was happening.”  Then Malone shot Gresham, who was walking back
with the motorcycle keys and a cell phone in hand.  

            Crystal
stated, “The next thing I recall happening is [Gresham] falling down the stairs
that goes into our bedroom.  He falls
back.  And then Malone steps down the
stairs . . ..  Well, he pointed the gun
at me.”  Gresham was “down on the ground .
. . one hand was holding his leg . . . the other hand was holding his keys
telling Malone, ‘Here.  Take your keys.  Take your keys.  Go.  Go.
 Get out of here.’”  Crystal testified that she “hollered at him and
said ‘Malone, what are you doing?’  And
he looked at me and then he just walked out” in a manner that seemed “calm like
nothing was bothering him.”  The police
were called immediately.

            Malone
exited the house, and witnesses watched as he “rode off on his bike.”  Crystal followed Gresham’s plea to rush to
Adams.  Crystal testified, “I slid into
the bedroom.  There was blood
everywhere.  [Adams] was on the
floor.  He was flopping around.”  She “immediately started covering bullet
holes.”  Allsbrooks ran into the house
and saw that Gresham “was on the bed holding his leg” where he had been
shot.  Allsbrooks also began putting
pressure on Adams’ wounds.  Despite the
group’s efforts, Adams died.

            Officer
Ruben K. Kimball was dispatched to the disturbance at the home.  On the way, he stopped to assist Malone, who
had fallen off of his motorcycle after driving it into a ditch.   Kimball spoke with a dispatcher before
exiting his vehicle, realized that Malone was connected to the shootings at the
home, and found Malone’s weapon in the motorcycle’s saddlebags.  Kimball observed Malone “was acting in a
very, I guess, carousing and jovial manner.” 
Malone was arrested.  While being
placed in the police unit, Malone remembered asking Kimball the reason for his
arrest.  In a jailhouse recording, Malone
stated to a visitor, “I got arrested.  I
didn’t remember anything.  It’s all
coming back in little flashes, little pictures.”  Malone was taken to the hospital on the night
of his arrest.  His blood-alcohol level
was .184 at the time of testing.  

            In
evaluating legal sufficiency of the evidence to prove the charged offense, we
review all the evidence in the light most favorable to the trial court’s
judgment to determine whether any rational jury could have found the essential
elements of aggravated assault of Gresham with a deadly weapon beyond a
reasonable doubt.  Brooks v. State, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing
Jackson v. Virginia, 443 U.S. 307,
319 (1979)); Hartsfield v. State, 305
S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref’d).  Our rigorous legal sufficiency review focuses
on the quality of the evidence presented. 
Brooks, 323 S.W.3d at 917
(Cochran, J., concurring).  We examine
legal sufficiency under the direction of Brooks,
while giving deference to the responsibility of the jury “to fairly resolve
conflicts in testimony, to weigh the evidence, and to draw reasonable
inferences from basic facts to ultimate facts.” 
Hooper v. State, 214 S.W.3d 9,
13 (Tex. Crim. App. 2007) (citing Jackson,
443 U.S. at 318–19); Clayton v. State,
235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

            Legal
sufficiency of the evidence is measured by the elements of the offense as
defined by a hypothetically correct jury charge.  Malik
v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); see also Vega v. State,
267 S.W.3d 912, 916 (Tex. Crim. App. 2008). 
Count two of Malone’s indictment[3]
alleges he “did then and there intentionally, knowingly, or recklessly cause bodily
injury to Joel Gresham with a firearm, and the defendant did then and there use
or exhibit a deadly weapon, to-wit:  a
firearm, during the commission of said assault.”

            Malone
committed the offense of aggravated assault if he intentionally, knowingly, or
recklessly caused bodily injury to Gresham and used or exhibited a deadly
weapon during the assault.  Tex. Penal Code Ann. §§ 22.01(a)(1),
22.02(a)(2) (West 2011).  A deadly weapon
is anything that, in the manner of its use or intended use, is capable of
causing death or serious bodily injury.  Tex. Penal Code Ann. § 1.07(a)(17)(B)
(West 2011).  It is undisputed that
Malone shot Gresham with a deadly weapon causing serious bodily injury.  The jury was free to find, based on the
evidence presented, that Malone’s act was done with the requisite intent.

            Malone’s
argument, however, complains that the evidence was insufficient to support the
jury’s rejection of his self-defense claim.  When a defendant asserts a claim of
self-defense, the State has the ultimate burden of persuasion.  Zuliani
v. State, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003).  The burden of persuasion does not require the
production of evidence; it requires only that the State prove its case beyond a
reasonable doubt.  Id. at 594.  When a jury
finds a defendant guilty, there is an implicit finding against the defensive
theory.  Id.  When reviewing the
sufficiency of the evidence concerning the jury’s rejection of self-defense, we
look to whether any rational jury could have found against the defendant on the
self-defense issue beyond a reasonable doubt.  Saxton
v. State, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991); Hernandez v. State, 309 S.W.3d 661, 665 (Tex. App.—Houston [14th
Dist.] 2010, pet. ref’d).

            Malone
testified in support of his claim of self-defense.  According to Malone, the following occurred
after he produced the gun at the doorstep:

[Gresham]’s
saying, “Get back in the f[***]ing house.”  [Adams]’s saying, “Is that a gun?  Do you have a gun?”  They come up to me on the porch.  [Adams] pushes me.  I keep my hand out at arm’s length, trying to
keep them, you know, back a little bit, keep my gun faced down, pointed at the
ground.  He’s pushing me back.  He pushes me into the house.  [Gresham] goes to the right, or my left.  [Adams] goes to my right.

 

When Gresham went to retrieve Malone’s
keys, Malone was “feeling very vulnerable at this moment in time” because “they
got me separated.”  Malone stated Adams
was pushing him while he attempted to keep Adams “at arm’s length.”  Malone testified Adams gave up.  

He backed off. 
And [Gresham] came up at me . . .. 
And he said, “I’ll kill you.” And then he comes at me, but he keeps his
left hand down at his side.  And he’s
coming at me with his right arm.  He’s
kind of pushing (demonstrating), you know, hitting me, hitting me, hitting
me.  And I’m trying to keep him—keep him
back at arm’s length . . ..  Then [Gresham]
swung at me.  And at this point I knew he
was—he was going to slap me; he was going to punch me, something.  And I blocked.  And then I struck him back.

            I
remember because I struck him right there in the shoulder.  I think it knocked him off balance because he
went back a couple of steps.

            That’s
when [Adams] said, “You’re dead” and he came at me.  That’s when he—he climbed on me—or jumped on
me.

 

According to Malone, Adams said, “Give me the f[***]ing gun”
and “You’re dead.”  Malone described that
Adams’ “right hand was on my left shoulder . . ..  And I’m thinking he’s stabbing[4]
me with something . . ..  I was trying to
get his arm off of me.”  “[Adams] gets
his hand on the barrel of my gun . . ..  Now
I know I’m in trouble.  He’s starting to
pull away.  He’s starting to pull the gun
away from me . . ..  I’m about to lose
the gun.  I’m losing my grip.  It’s sliding out.”  Malone testified he pulled the trigger and
shot Adams at this time.  Adams sustained
eight gunshot wounds.[5]  

            When he “saw
[Adams] fall back,” Malone “heard steps coming up behind me.”  He turned and fired.  The first shot missed, so he pulled the
trigger again.  Malone “saw an individual
coming at me like this, like he was going to dive-tackle me.” After shooting Gresham,
Malone took his motorcycle keys from Gresham’s hand and left.  As a result of the alleged altercation,
Malone testified he sustained a black eye, and “[p]retty much the whole left
side of my face was swollen, and my shoulder was swollen.”  Malone’s mother testified that, during her
first visit with Malone while he was in jail, his “left eye was just humungous,
red, puffy with a cut over it on the fatty part” and that Malone’s eye was
“swollen shut.”  She also claimed Malone
“had a thing on this shoulder . . .. It was like dents, big dents in his
shoulder . . .. One of them had a scratch in it.” 

            Ashley
Denby, who transported Malone to the hospital following his arrest, did not
recall any injuries on Malone.  Officer
Jose Mantilla, who booked Malone into jail, did not see any injuries, and none
were clearly indicated in Malone’s photograph taken during the booking
process.  Malone told the nurse his pain
rating was “zero.”  Staff Sergeant Jesus
Guerrero, who booked Malone back into jail after hospital treatment, also
testified that no injuries were present. 

            Although
Cockrell heard “some fussing,” “argument,” and “foot steps . . . like, maybe
somebody was being pushed,” Malone’s version of the altercation that led to the
shooting was countered by several other witnesses.  Gresham testified, “There was never a scuffle
in my house,” and that he did not use force or see anyone use force against
Malone.  According to Crystal, the
conversation between Adams and Malone was “[b]asically, trying to get Malone to
hand over the gun so things wouldn’t exceed [sic] to another level.”  Perkins did not hear any fighting or
commotion.  Noting that Malone was “[a]rm
distance” from Adams, Skates testified, “I seen them two talking back and
forth.  Mr. Adams took his right arm
reaching out after he asked if the gun was loaded” just before being shot.  Finally, although Malone testified Adams “was
right at me” “in the intimate space” when he shot Adams eight times, Malone
could not explain the lack of visible blood on his clothing.  

            One may use
force against another “when and to the degree the actor reasonably believes the
force is immediately necessary to protect the actor against the other’s use or
attempted use of unlawful force.”  Tex. Penal Code Ann. § 9.31 (West 2011).
 This includes using deadly force against
the other if “the actor would be justified in using force against the other
under Section 9.31,” and “when and to the degree the actor reasonably believes
the deadly force is immediately necessary” “to protect the actor against the
other’s use or attempted use of unlawful deadly force.”  Tex.
Penal Code Ann. § 9.32(a) (West 2011). 
Because the Jackson standard is the only standard we apply, we
examine the evidence in the light most favorable to the verdict.

            Malone was
the only eyewitness who testified that the shootings were an act of
self-defense.  Malone agreed on the stand
that his statements asking officers whether he “had hurt somebody” indicated
lack of recollection.  His blood-alcohol
level, hours after the event, was .184. 
Pictures taken during Malone’s booking and the testimony of officers who
encountered Malone are inconsistent with Malone’s claimed injuries from the
alleged altercation.  As the judge of
credibility, the jury was free to discount Malone’s testimony.  

            The
jury was free to reject the theory of self-defense, even if it believed some or
all of Malone’s testimony.  With respect
to Gresham, Malone recalled, “I turned when I heard the footsteps coming up
behind me . . ..  I fired a shot.  [Gresham] kept coming at me.  I fired again. That’s when he fell.”  The use of deadly force is justified only to
protect the actor against another’s use of deadly force.  Malone’s testimony that, “in his left hand
[Gresham] had something . . ..  I thought
it was keys,” established that Malone had time to observe Gresham and verify
that he was not carrying a weapon.  Even
with the alleged statement by Gresham that he would kill Malone, which was made
earlier, the jury could have found that Malone’s testimony of the dive-tackle
did not establish Gresham was using or attempting to use any deadly force.  Therefore, because the jury could find Malone
was not protecting himself from Gresham’s “use or attempted use of unlawful
deadly force,” either because they disbelieved any altercation occurred between
Gresham and Malone or because they did not find any use of deadly force by
Gresham, the evidence was sufficient to reject Malone’s self-defense
theory.  Tex. Penal Code Ann. § 9.32(a)(2)(A).

            The
evidence was sufficient to support the conviction.

 

(2)        The Jury Charge Was Proper on the Two
Self-Defense-Negating Issues of Provocation and           Unlawfully Carrying a Weapon

 

            In
accordance with Section 9.31(a)(2) and (3) and Section 9.32(b)(2) and (3) the
jury was also instructed that a belief that deadly force was immediately
necessary was reasonable unless they found (A) that Malone provoked Gresham or
(B) that Malone was engaged in the unlawful carrying of a weapon at the time he
shot Gresham.[6]

            Malone
argues that the trial court erred in submitting these instructions to the
jury.  Our review of alleged jury charge
error involves a two-step process.  Abdnor v. State, 871 S.W.2d 726, 731
(Tex. Crim. App. 1994); see also Sakil v.
State, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009).  Initially, we determine whether an error
occurred, and then evaluate whether sufficient harm resulted from the error to
require reversal.  Abdnor, 871 S.W.2d at 731–32.

A
charge on provocation is required when there is sufficient evidence (1) that
the defendant did some act or used some words which provoked the attack on him,
(2) that such act or words were reasonably calculated to provoke the
attack, and (3) that the act was done or the words were used for the
purpose and with the intent that the defendant would have a pretext for
inflicting harm upon the other.

 

Smith v. State, 965 S.W.2d 509, 513 (Tex. 1998).  A provocation instruction should be submitted
to the jury only “when there is evidence from which a rational jury could find
every element of provocation beyond a reasonable doubt.”  Id.
at 514.  Our inquiry is whether “a
rational jury could have found provocation beyond a reasonable doubt, viewing
the evidence in the light most favorable to giving the instruction.”  Id.

            During the
charge conference, Malone’s attorney objected:

 

[T]he
State has failed to raise an issue of provocation. . .. Without sufficient
evidence for the jury to find beyond a reasonable doubt that my client provoked
anybody, the Court should not include as a requirement that the jury find
“provoked” but should find as a matter of law that he did not provoke either of
the victims.

 

            While Malone
did provide some evidence that he thought he was being attacked by Gresham,
there was evidence from which the jury could find that Malone provoked
Gresham.  The first element is
provocation in fact.  The jury heard that
Malone came to the front door with pistol in hand and used profanity in asking
who was tampering with his motorcycle. 
There was testimony that Malone physically blocked Gresham from entering
his own residence.  Cockrell and Malone
testified that an argument ensued between Malone and Adams.  Malone testified that he shot Adams and then
heard Gresham’s footsteps coming toward him. 
“Usually the act or words which cause the attack will be leveled
directly at the victim.  However, acts or
words directed at a third party may likewise provoke a difficulty.”  Smith,
965 S.W.2d at 514.  The jury could find
Malone’s use of profanity, carrying a loaded gun at Gresham’s girlfriend’s
home, being noticeably drunk, failing to put the gun away, arguing with Adams,
and shooting Gresham’s friend Adams were all acts of provocation.

            The second
element of provocation asks whether the defendant’s acts or words were
reasonably calculated to provoke the attack. 
“An act is reasonably calculated to cause an attack if it is reasonably
capable of causing an attack, or if it has a reasonable tendency to cause an
attack.”  Id. at 517.  In Smith, the victim intervened in an
argument between the defendant and a third person, by brandishing a knife and
warning the defendant not to speak to the third person.  Id.  The court noted that the evidence supported a
conclusion that continued exchanges between the defendant and the third person
“were likely to have a volatile effect on the victim such that the victim
might, and probably would, have attacked appellant to make good on his
warning.”  Id.  The court found “the act
of provocation in this case, the continued argument by the appellant with [the third
person], could have been found by the jury under the circumstances to have been
reasonably calculated to cause an attack by the victim.”  Id. at
518.  Here, Malone testified Gresham
fought with him and told him, “I’ll kill you.” 
Malone testified he fought with Adams after this statement.  Malone was continuously asked before and
during the alleged fight to put his gun away. 
His failure to put the gun down, his argument with Adams, and his
shooting Adams could have been found by the jury under the circumstances to
have been reasonably calculated to cause an attack by Gresham, given his
earlier alleged threat.

            The
third element of the provocation doctrine involves the question of intent.  Id.
 This
element “is a matter of fact, to be determined from all of the
circumstances.”  Id.  In Smith, the court decided that evidence supporting the conclusion
that the defendant continued to argue with a third person despite the victim’s
threat and request to stop was enough to raise the question of whether it could
be the defendant’s aim to “continue the argument to inspire the deceased to
attack the appellant so that the appellant would have a pretext for killing the
deceased.”  Id. at 519.  Here, Gresham’s girlfriend was inside the
house.  Malone was reportedly drunk and
irrational and was carrying a loaded deadly weapon which he appeared to be
prepared to use.  There was evidence
that, despite repeated entreaties, Malone refused to put his weapon away at the
door and physically blocked Gresham from entering the home to retrieve the
motorcycle keys.  He continued to argue
and hold his weapon when inside the home, despite requests from Gresham and
Adams, and the alleged threat made by Gresham. 
Even after shooting Adams, Malone still held onto his weapon.  Knowing that Crystal was inside the home,
along with the presence of other partygoers, whom Gresham could have felt the
responsibility to protect, the question was raised, in the same posture as it
was raised in Smith, as to Malone’s
intent in his continued refusal to yield the weapon.

            The evidence
was sufficient to raise the issue of provocation.  Therefore, submission of the provocation
instruction was not erroneous.

            Next, pursuant
to Section 46.02 of the Texas Penal Code, the court instructed the jury that
unlawful carrying of a weapon

is
committed if a person intentionally, knowingly, or recklessly carries on or
about his or her person a handgun if the person is not on the person’s own
premises or premises under the person’s control, or inside of or directly en
route to a motor vehicle that is owned by the person or under the person’s
control.  You are instructed, however,
that a person is not unlawfully carrying a weapon if the person is traveling.

 

It is undisputed that Malone was carrying a gun on Crystal’s
premises, not his own.[7]


 

            Malone
objected to the inclusion of the court’s instructions with respect to unlawful
carrying of a weapon because he believed he was “still traveling as a matter of
law.”  Yet, “[t]he question of whether
one is a ‘traveler’ is a fact question to be resolved by the trier of fact.”  Illingworth
v. State, 156 S.W.3d 662, 664 (Tex. App.—Fort Worth 2005, no pet.) (citing Smith v. State, 630 S.W.2d 948, 950
(Tex. Crim. App. 1982)).  The Legislature
has never defined what “traveling” means, and its precise meaning has been the
subject of much debate.  Id. at 664–65; Ayesh v. State, 734 S.W.2d 106, 108 (Tex. App.—Austin 1987, no
pet.).

            Malone
believed that he established he was traveling since he travelled from another
county—a distance of approximately eighty miles—to attend the party and was
promised an overnight stay.  Texas courts
have generally distinguished “traveling” based on the distance and duration of
the trip.  See Birch v. State, 948 S.W.2d 880, 882 (Tex. App.—San Antonio
1997, no pet.); Illingworth, 156
S.W.3d at 665; Ayesh, 734 S.W.2d at
108; Sanchez v. State, 122 S.W.3d
347, 356 (Tex. App.—Texarkana 2003, pet. ref’d) (driving fifteen minutes
between cities in different counties did not constitute traveling).  “Some cases hold that once a traveler arrives
at his destination and secures a room he is no longer a traveler.”  Illingworth,
156 S.W.3d at 665–66 (citing Ballard v.
State, 167 S.W. 340 (Tex. Crim. App. 1914); see Evers v. State, 576 S.W.2d 46, 50 (Tex. Crim. App. 1978)).  The evidence did not establish as a matter of
law that Malone was travelling.  Before
the shootings, Malone had been shown to a room where he would stay overnight,
and his destination when he left his home had been the party.[8]  No evidence suggests he had any further
destination.  Therefore, the trial court
did not err in submitting the unlawful carrying of a weapon issue to the jury in
the face of Malone’s assertion that he was traveling.

            We affirm the trial court’s
judgment. 

 

 

 

 

                                                                                    Josh
R. Morriss, III

                                                                                    Chief
Justice

 

Date Submitted:          October
18, 2011        

Date Decided:             November
3, 2011

 

Do Not Publish











[1]Originally
appealed to the Twelfth Court of Appeals, this case was transferred to this
Court by the Texas Supreme Court pursuant to its docket equalization
efforts.  See Tex. Gov’t Code Ann.
§ 73.001 (West 2005).  We are unaware of
any conflict between precedent of the Twelfth Court of Appeals and that of this
Court on any relevant issue.  See Tex.
R. App. P. 41.3.

 





[2]Although
the distance between the two cities is not included in the record, we may take
judicial notice of the location of “cities, counties, boundaries, dimensions,
and distances because geographical facts such as these are easily ascertainable
and capable of verifiable certainty.”  Butts Retail, Inc. v. Diversifoods, Inc.,
840 S.W.2d 770, 774 (Tex. App.—Beaumont 1992, writ denied).





[3]In
count one, Malone was indicted for the murder of Adams.  Following deadlock among the jury, the trial
court declared a mistrial as to that charge.





[4]Malone
testified, “I thought he had like a screwdriver or something.”  Nevertheless, it was undisputed that Adams and
Gresham did not have any weapons during the shooting.   

 





[5]This
fact alone placed Malone’s claim of self-defense in serious jeopardy.





[6]As
described in detail below, the jury could have also rejected Malone’s self-defense
theory based on either a finding that Malone provoked Gresham or that Malone
was unlawfully carrying a weapon.





[7]Malone
did not have a concealed handgun license. 





[8]The
State “is not required to introduce evidence controverting appellant’s
assertion of ‘traveler’ status”; here, the jury would have been free to find
that Malone had arrived at his destination and was no longer traveling at the
time of the offense.  See Ayesh,
734 S.W.2d at 108.